UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
VICTOR CORTES,

                            Plaintiff,

            - against-

P&N TOWING COLLISION PAINT INC., PEDRO
TALLER, *In His Individual and Official Capacities*,
and CARLOS ESPINOSA, *In His Individual and
Official Capacities*,

                         Defendants.

------------------------------------------------------------------X

**Docket No.**

**COMPLAINT**

***PLAINTIFF DEMANDS
A TRIAL BY JURY***

      PLAINTIFF VICTOR CORTES, by and through his attorneys, PHILLIPS &
ASSOCIATES, hereby complains of DEFENDANTS, and alleges as follows:

### NATURE OF THE CASE

1.      PLAINTIFF complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified*,
<u>42 U.S.C.</u> §§ 2000e to 2000e-17 (*as amended*) ("<u>Title VII</u>"), <u>Americans with Disabilities
Act of 1990</u>, <u>42 U.S.C.</u> §§ 12101, *et seq.* ("<u>ADA</u>"); the <u>New York State Human Rights
Law</u>, <u>New York State Executive Law</u> §§ 296, *et seq.* ("NYSHRL"), and the <u>New York
City Human Rights Law</u>, <u>New York City Administrative Code</u> §§ 8-107, *et seq.*
("<u>NYCHRL</u>")*, and seeks damages to redress the injuries PLAINTIFF suffered as a result
of being discriminated against, sexually harassed, subjected to an ongoing and continuous
hostile work environment, and retaliated against by his employer solely due to his
**sex/gender (male)**, **national origin (Puerto Rican)**, and **caregiver status**.

2.      In addition, this is a civil action based upon violations that DEFENDANT P&N
TOWING COLLISION PAINT, INC. committed against PLAINTIFF as guaranteed to
him by **New York Labor Laws §§ 195(3), and 196(b)**; and any other claim(s) that can

be inferred from the facts set forth herein.

3.    PLAINTIFF VICTOR CORTES was employed by DEFENDANT P&N TOWING
      COLLISION PAINT, INC., as a "Painter," until he was wrongfully terminated as
      described below.

4.    From the day that PLAINTIFF began working at P&N TOWING COLLISION PAINT,
      INC., PLAINTIFF was subjected to an ongoing and continuous racially and gender-based
      hostile work environment based on his sex/gender and national origin. Specifically,
      PLAINTIFF was subjected to discriminatory insults, ridicule, humiliation, differential
      treatment and unequal terms and conditions of employment, when compared to his
      similarly-situated coworkers.

5.    Among other things, PLAINTIFF'S coworkers referred to him as "*pendejo," "maricon*,"
      and "*welebicho*," which all (in sum and substance) are insults based on PLAINTIFF'S
      sex/gender. PLAINTIFF was singled out for these gender/sexual based insults based on
      his sex/gender and national origin. These discriminatory insults were made to/against
      PLAINTIFF in the presence, or with knowledge of, DEFENDANTS who took no action
      and/or called PLAINTIFF "sensitive" when he complained.

6.    PLAINTIFF was also subjected to physical sexual abuse by his coworker, who touched
      PLAINTIFF, grabbed/pinched PLAINTIFF'S buttocks, while making sexually
      derogatory comments (*i.e.* "*that pussy in mine*"), and other sexually humiliating epithets.

7.    PLAINTIFF was wrongfully terminated after leaving the workplace in response to a
      family emergency wherein his newborn child was experiencing illness. PLAINTIFF
      advised management that he needed to leave to attend to his caretaker emergency, when
      PLAINTIFF was immediately terminated and told, "*fix your family issues*."

8.    Finally, during the course of his employment, PLAINTIFF was subjected to differential

treatment in that he was not afforded: paystubs or proof of salary/income, wage payment information, proper proof of employment, ability to perform overtime; uniforms and/or other equal terms and conditions of employment.

9.   **Then, to add insult to injury, DEFENDANTS callously terminated PLAINTIFF at the worst possible time – when they knew that PLAINTIFF needed his employment and employment benefits due to his newborn child and/or due to his status as a caretaker of a newborn child.**

10.   PLAINTIFF VICTOR CORTES asserts that P&N TOWING COLLISION PAINT INC. DEFENDANTS allowed an intolerable work environment to exist that was permeated with discrimination and retaliation against PLAINTIFF simply because of his sex/gender and national origin in violation of the subject statutes herein.

### JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

11.   Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and 1343.

12.   The Court has supplemental jurisdiction over the claims that PLAINTIFF has brought under State and City law pursuant to 28 U.S.C. § 1367.

13.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more DEFENDANTS reside within the Southern District of New York or the acts complained of occurred therein.

14.   By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 26, 2022; (b) receiving a Notice of Right to Sue from the EEOC on November 23, 2022; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New

York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the <u>New York City Administrative Code</u>, PLAINTIFF has satisfied all of the procedural prerequisites for the commencement of the instant action.

15.   A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.


## PARTIES

17.   At all times relevant hereto, **VICTOR CORTES ("PLAINTIFF")** is a 31-year-old Hispanic/Latino, heterosexual male and a resident of the Bronx County, New York. PLAINTIFF was employed by **DEFENDANT P&N TOWING COLLISION PAINT INC.**, as a "*Painter*," from on or about September 20, 2021, until his wrongful termination on February 7, 2022.

18.   At all times relevant hereto, **P&N TOWING COLLISION PAINT INC., (hereinafter, "DEFENDANT P & N")** is a domestic business corporation that exists under the laws of the State of New York. **DEFENDANT P&N TOWING COLLISION PAINT INC.,** owns, operates, and manages multiple locations, including 191 Bruckner Blvd., Bronx, New York 10454, where the discriminatory conduct took place. **DEFENDANT P&N** employs well over fifteen employees.

19.   **DEFENDANT PEDRO TALLER (hereinafter "DEFENDANT TALLER")** is a manager at/for **DEFENDANT P&N. DEFENDANT TALLER** was PLAINTIFF'S direct manager, supervisor, and had supervisory authority over PLAINTIFF. **DEFENDANT TALLER** had the authority to hire, fire, or affect the terms and conditions of PLAINTIFF'S employment, or to otherwise influence the decision-maker of the same. **DEFENDANT TALLER** is being sued herein in his individual and official

capacity.

20.    **DEFENDANT CARLOS ESPINSOA (hereinafter "DEFENDANT ESPINOSA")** is a Shop Manager at/for **DEFENDANT P&N. DEFENDANT ESPINOSA** was PLAINTIFF'S direct manager, supervisor, and had supervisory authority over PLAINTIFF. **DEFENDANT ESPINOSA** had the authority to hire, fire, or affect the terms and conditions of PLAINTIFF'S employment, or to otherwise influence the decision-maker of same. **DEFENDANT ESPINOSA** is being sued herein in his individual and official capacity.

21.    **DEFENDANTS TALLER and ESPINOSA,** are collectively referred to as "**INDIVIDUAL DEFENDANTS**."

22.    **DEFENDANTS, P&N, TALLER and ESPINOSA** are collectively referred to as "**P&N DEFENDANTS**."

<u>**MATERIAL FACTS**</u>

23.    PLAINTIFF began working for P&N DEFENDANTS on or about September 4, 2021, as an "Painter," earning approximately $25 per hour.

24.    From the outset, DEFENDANTS began to subject PLAINTIFF to unlawful terms and conditions of employment.

<u>**Defendants' Failure To Provide Proof Of Employment And/Or Wages**</u>:

25.    From September 4, 2021, until about January 24, 2022, DEFENDANTS refused to provide PLAINTIFF with paystubs and/or proof of wages as required by the New York Labor Laws.

26.    DEFENDANTS would provide PLAINTIFF with no proof of employment, despite numerous requests.

27.    In September 2021, after weeks of employment, PLAINTIFF noticed that he was not

properly given onboarding documentation and was being treated by DEFENDANTS as if he worked off the books.

28.   PLAINTIFF protested the treatment and asked DEFENDANT TALLER to place him on the books and provide him with appropriate documentation like the other employees at P&N.

29.   DEFENDANT TALLER ignored PLAINTIFF and PLAINTIFF'S request(s).

30.   Again, in October 2021, PLAINTIFF asked DEFENDANT TALLER to add him to the books and to provide him with proper employment paperwork, as P&N did with the other similarly-situated employees.

31.   PLAINTIFF explained to DEFENDANT TALLER that PLAINTIFF wanted to be able to claim/file for taxes as is required, and did not expect to be working off the books.

32.   Again, on February 4, 2022, DEFENDANTS provided PLAINTIFF with a personal check for $925, for 37 hours of work, which did not come with a statement or proof of hours or wages.

33.   Still, as of the date of this complaint, DEFENDANT P&N did not properly report PLAINTIFF'S employment at P&N and did not properly report PLAINTIFF'S wages.

34.   Indeed, as of the date of this Complaint, PLAINTIFF has not received any tax filing documents such as a statement of wages, Form W-2 or a Form 1099, despite P&N's obligation to provide same, and despite PLAINTIFF'S numerous requests.

35.   No taxes were taken from PLAINTIFF'S payments and no Form 1099 was provided to PLAINTIFF. As such, DEFENDANTS never notified the State of New York that PLAINTIFF was ever employed at P&N.

**Defendants Withheld Certain Employee Benefits From Plaintiff While Providing The Same To His Similarly Situated Dominican Co-workers**

36.     At DEFENDANT P&N, employees are required to wear work pants, a shirt, and boots pursuant to DEFENDANT P&N'S uniform policy, and with the exception of boots, company branded uniforms were provided to each employee.

37.     DEFENDNAT P&N, however, did not provide PLAINTIFF with a uniform on his first day of work.

38.     PLAINTIFF asked DEFEDANT TALLER and Peter Taller ("Peter"), an Office Staff member and DEFENDANT TALLER's son, multiple times if he could order his uniform through the company. When DEFENDANT TALLER finally got back to PLAINTIFF, DEFENDANT TALLER told PLAINTIFF that employees must pass a two-month waiting period to obtain a company uniform.

39.     PLAINTIFF was surprised by DEFENDANT TALLER'S response since DEFENDANTS failed to mention that on the day of his hire, and by DEFENDANT TALLER's dodgy tone, the policy seemed to PLAINTIFF to be something DEFENDANT TALLER had made up on the spot.

40.     As a result of this alleged policy, PLAINTIFF was forced to spend $350 on appropriate work pants, shirts, and boots for work at DEFENDANT P&N.

41.     DEFENDANTS never provided PLAINTIFF with a uniform, unlike his similarly situated coworkers.

42.     From in or around October 2021 to January 24, 2022, DEFENDANTS also refused to allow PLAINTIFF to work overtime while allowing their similarly situated Dominican employees to work overtime.

43.     PLAINTIFF became aware of the discrimination when he arrived at DEFENDANT P&N

on a Saturday in October 2021, to pick up a check.  On that day, PLAINTIFF found his co-workers working even though DEFENDANTS had advised PLAINTIFF that his similarly situated coworkers did not work on Saturdays.

44.   PLAINTIFF was upset and hurt by this discovery, because just weeks before, PLAINTIFF had asked DEFENDANT TALLER for permission to work additional hours during the week and on Saturdays and was plainly told he could not.

45.   When PLAINTIFF asked DEFENDANT TALLER for extra hours, DEFENDANT TALLER falsely alleged that *"no one works overtime."*

46.   As such, it was clear to PLAINTIFF that DEFENDANTS were not allowing PLAINTIFF (only) to work overtime.

47.   The only difference between PLAINTIFF and his similarly situated coworkers is his nationality, Puerto Rican (the only Puerto Rican employee at P&N).

48.   PLAINTIFF noticed that the Dominican employees were getting overtime hours, while PLAINTIFF was not.

49.   To add insult to injury, on one occasion, DEFENDANTS allowed PLAINTIFF's co-workers to laugh at, and humiliate, PLAINTIFF without reprimand when PLAINTIFF asked for and was refused overtime.

50.   Specifically, on February 3, 2022, toward the end of his shift, DEFENDANT ESPINOSA told PLAINTIFF to complete a U-HAUL paint job that same day.

51.   PLAINTIFF knew that if he started working on the U-HAUL, he would have to work overtime to complete the job. As such, PLAINTIFF called DEFENDANT TALLER to confirm that he would pay for his overtime.

52.   To PLAINTIFF'S disappointment, DEFENDANT TALLER told PLAINTIFF he would not be paid for any work past 5:00 PM, the end of PLAINTIFF's shift, and reiterated that

PLAINTIFF was not allowed to work overtime.

53.     As a result, PLAINTIFF told his co-worker, "Cepherino" that he would have to finish the painting job for PLAINTIFF.

54.     The next day, DEFENDANT TALLER told PLAINTIFF that Cepherino and PLAINTIFF's co-worker, Ayendi, laughed about PLAINTIFF being denied overtime to work on the U-HAUL.

55.     DEFENDANTS knew or should have known that their selective overtime policy – **that only applied to PLAINTIFF** – was blatant discrimination.

56.     DEFENDANTS had no good faith business reason for denying PLAINTIFF overtime pay.

57.     DEFENDANTS are only interested in granting overtime pay to their similarly situated employees, who are all Dominican. So much so, in fact, that DEFENDANT TALLER felt unashamed to tell PLAINTIFF that PLAINTIFF'S co-workers were mocking him as a result of the discriminatory treatment.

58.     However, DEFENDANTS' discriminatory campaign to deny PLAINTIFF opportunities to earn money did not stop there.

59.     When the workload was (allegedly) light, DEFENDANTS always chose to send PLAINTIFF home first or called PLAINTIFF to tell PLAINTIFF he was not needed for the day, causing PLAINTIFF to leave the shop unpaid or lose a whole day's work.

60.     It soon became clear to PLAINTIFF, however, that DEFENDANTS weren't always honest about the workload at the shop.

61.     By way of example, DEFENDANTS told PLAINTIFF to not come in on January 13 or 14, 2022, because there was no work for him to do.

62.     PLAINTIFF decided to go to work any way to pick up his check. When PLAINTIFF

arrived, PLAINTIFF found the shop busy with more than enough work for him to do.

63.    PLAINTIFF also observed that despite the allegedly light workload, all of PLAINTIFF's co-workers were at work that day.

64.    As the only Puerto Rican employee at DEFENDANT P&N, these suspect schedule changes that only affected PLAINTIFF caused PLAINTIFF to feel ostracized, overlooked, and discriminated against.

65.    In addition, DEFENDANTS denied PLAINTFF paid leave for quarantining due to COVID-19 even though, at a previously held staff meeting, DEFENDANTS informed its employees that DEFENDANT P&N would provide paid leave to any employee who needed to quarantine due to exposure to COVID-19 or were required to quarantine as a precautionary measure.

66.    Specifically, during the week of Christmas, PLAINTIFF'S partner tested positive for COVID-19. PLAINTIFF tested the same day and tested negative.

67.    Since PLAINTIFF tested negative for COVID-19, PLAINTIFF believed that he could return to work and arrived at his next scheduled shift.

68.    Upon arrival, PLAINTIFF met with Peter and handed him the test results from his medical provider proving he had tested negative for COVID-19.

69.    Peter told PLAINTIFF that it did not matter that PLAINTIFF tested negative for COVID-19. PLAINTIFF was not allowed to punch into work and would need to wait outside until he could determine whether PLAINTIFF would be permitted to work for the rest of the week.

70.    PLAINTIFF stood outside for over two hours, but Peter never came back with an update. As such, PLAINTIFF went home and called Peter at noon to see what DEFENDANTS decided.

71.   Peter answered the phone and told PLAINTIFF that DEFENDANT TALLER said PLAINTIFF must quarantine for the rest of the week and provide a negative test result next week when he returned to start his shift.

72.   PLAINTIFF then asked Peter if DEFENDANT P&N was going to pay PLAINTIFF for the time off, as stated during the meeting and afforded to other employees.

73.   Under New York Law, individuals that are required to quarantine due to COVID-19 concerns are entitled to at least 5 days paid leave. Given the size of DEFENDANTS' business and their number of employees, PLAINTIFF was entitled to this leave and at least 5 days' pay during the period of quarantine. (*see,* https://paidfamilyleave.ny.gov/covid-19-paid-leave-guidance-employers)

74.   DEFENDANTS ignored PLAINTIFF'S concerns and request for information related to his rights pursuant to COVID-19 leave.

75.   In addition, PLAINTIFF was entitled to sick time under the Laws, but was never afforded any sick time.

76.   Peter, however, ignored PLAINTIFF'S questions and only repeated what DEFENDANT TALLER said before he hung up the phone on PLAINTIFF.

77.   Unsurprisingly and in violation of New York's COVID-19 Paid Sick Leave Laws, DEFENDANTS did not pay PLAINTIFF for the entire week he was forced to quarantine at home, and DEFENDANTS never advised PLAINTIFF of his rights (nor provided him with information) under the New York Law.

78.   Instead, in violation of the Laws of New York, DEFENDANTS flatly told PLAINTIFF that there would be no compensation for employees that were required to quarantine due to COVID-19.

79.   The next week, PLAINTIFF spoke to DEFENDANT TALLER and told him that he

continues to test negative for COVID-19, is symptom free, and asked TALLER if DEFENDANT P&N could pay PLAINTIFF for the week he was forced to quarantine.

80.   DEFENDANT TALLER flatly told PLAINTIFF that PLAINTIFF would not be compensated for being required to quarantine due to COVID-19.

81.   As a result, PLAINTIFF was not paid for that entire period.

**Defendants allowed their employees to disparage and sexually harass PLAINTIFF**

82.   In or around October 2021, PLAINTIFF's co-workers began calling PLAINTIFF derogatory names such as "***pendejo***", "***maricon***", and "***welebicho***", which in translation means "*homosexual*", "*bitch"* and other sexually derogatory terms in Spanish.

83.   PLAINTIFF'S coworkers referred to PLAINTIFF in these gender-based sexually derogatory ways because PLAINTIFF is a male.

84.   DEFENDANTS' did not allow female employees in the facility to be referred to in these sexually derogatory ways.

85.   However, DEFENDANTS allowed their employees to refer to PLAINTIFF in this discriminatory manner.

86.   PLAINTIFF felt offended, hurt, and ostracized by the constant discriminatory name calling and asked his co-workers to refrain from calling him those derogatory words.

87.   In response, PLAINTIFF'S co-workers laughed at him (or ignored his concerns) and continued to hurl discriminatory insults at him.

88.   PLAINTIFF told the shop manager, DEFENDANT ESPINOSA, about harassment by his co-workers hoping that DEFENDANT ESPINOSA would finally put a stop to their unrelenting name-calling (protected activity).

89.   To PLAINTIFF'S shock and disappointment, however, DEFENDANT ESPINOSA dismissed PLAINTIFF's complaint and told him to ***"stop being sensitive."***

90.    Since DEFENDANT ESPINOSA was the shop manager, and PLAINTIFF feared being retaliated against if he complained to DEFENDANT TALLER about DEFENDANT ESPINOSA and his co-workers, PLAINTIFF felt that he had no choice but to continue to put-up with the name calling.

91.    PLAINTIFF'S co-workers' tormenting behavior, however, was continuous and unrelenting.

92.    In or around January 2022, "Tomas," an Auto Body Technician at DEFENDANT P&N, grabbed PLAINTIFF'S butt and told PLAINTIFF, loudly and in front of his coworkers, ***"That pussy is mine!"***

93.    PLAINTIFF was outraged at being humiliated, especially in front of his coworkers, who stood by and laughed.

94.    PLAINTIFF'S co-worker, "Ayendi" was one of the workers that watched Tomas touch PLAINTIFF inappropriately but said nothing and instead laughed at the harassment.

95.    Due to DEFENDANTS' lack of training and supervision of its employees with regard to discrimination in the workplace, Tomas felt emboldened to sexually harass and sexually assault PLAINTIFF in front of others in the workplace.

96.    On several occasions thereafter, Tomas walked by PLAINTIFF and pinched PLAINTIFF'S butt without his consent.

97.    Each time, PLAINTIFF unequivocally told Tomas to refrain from touching him (protected activity), but Tomas did not seem to care.

98.    Tomas appeared to be determined to emasculate PLAINTIFF in front of the other employees at P&N, due to PLAINTIFF'S sex/gender and national origin.

99.    Tomas did not subject any female employees to the same sexual assault and battery.

100.   Tomas did not subject any non-Puerto Rican male employees (such as Ayendi, who

seemed to find same amusing) to similar humiliating and emasculating conduct.

101.   Both Tomas and Ayendi would look at PLAINTIFF and erupt into laughter when he showed distress from being touched, or when he complained about being touched.

102.   To Tomas and Ayendi, sexually harassing PLAINTIFF in the workplace, and causing PLAINTIFF to get upset as a result, was daily entertainment.

103.   Tomas' touching PLAINTIFF without PLAINTIFF'S consent made PLAINTIFF feel extremely uncomfortable and made working at DEFENDANT P&N increasingly more hostile.

104.   PLAINTIFF did not report Tomas' sexual harassment behavior to management, however, because when PLAINTIFF had complained in the past about his co-workers, DEFEFENDANT ESPINOSA laughed at PLAINTIFF and told him he was ***"too sensitive."***

105.   As such, PLAINTIFF believed (based on P&N DEFENDANTS' past actions, or lack thereof) any report to DEFENDANT P&N about harassment or discrimination would be futile.

**Defendants unlawfully terminated PLAINTIFF's employment**

106.   On February 7, 2022, PLAINTIFF'S partner called DEFENDANT P&N at approximately 11:30 a.m., to notify PLAINTIFF that he had a medical emergency happening at home that required PLAINTIFF to come home.

107.   Specifically, PLAINTIFF learned that PLAINTIFF'S newborn daughter was experiencing severe digestive issues and needed to go to the emergency room right away.

108.   However, Chanley, the receptionist, never passed the message to PLAINTIFF.

109.   PLAINTIFF was busy working on a paint job and did not check his phone until 12:15PM, when he discovered several missed calls from his home.

110.   PLAINTIFF immediately went to the receptionist desk and asked Chanley if his partner called the office.

111.   Dismissively, Chanley confirmed that PLAINTIFF did get a call from his partner and cavalierly stated that PLAINTIFF'S partner would call PLAINTIFF.

112.   PLAINTIFF finally got in touch with his partner, who told him that their daughter's condition was serious and that she needed PLAINTIFF to assist her in taking their daughter to the hospital.

113.   PLAINTIFF promptly told Chanley and Cepherino that he was leaving due to a family emergency and left for the day.

114.   At approximately 4:02 pm that same day, PLAINTIFF received a call from DEFENDANT TALLER instructing him to contact DEFENDANT ESPINOSA.

115.   PLAINTIFF called DEFENDANT ESPINOSA and told DEFENDANT ESPINOSA that he left early for the day to respond to a family emergency and said that before he left, he told Chanley and Cerephino why he was leaving.

116.   DEFENDANT ESPINOSA alleged that neither Chanley or Cerephino were aware that PLAINTIFF left work, and asked PLAINTIFF again to explain where he had been.

117.   PLAINTIFF repeated the reason for his early departure to DEFENDANT ESPINOSA and told DEFENDANT ESPINOSA that Chanley and Cerephino knew exactly why he left the facility.

118.   DEFENDANT ESPINOSA, however, told PLAINTIFF he did not believe PLAINTIFF and that there had to be a better reason for PLAINTIFF'S departure.

119.   PLAINTIFF affirmed that he was telling the truth about his reason for leaving.

120.   Callously, DEFENDANT ESPINOSA then told PLAINTIFF that when PLAINTIFF *"fixed his family issues,"* PLAINTIFF can give him a call back.

121.   In addition, DEFENDANT ESPINOSA falsely accused PLAINTIFF of taking too much time off and was terminating his employment because he needed someone who was (allegedly) "*readily available to work.*"

122.   PLAINTIFF was shocked and confused. DEFENDANT ESPINOSA had never informed PLAINTIFF he had been taking too much time off

123.   In fact, the only time(s) that PLAINTIFF took days off from work were the days that DEFENDANTS forced PLAINTIFF to quarantine for COVID-19 exposure, and PLAINTIFF took two days off in January 2022 for maternity leave, due to the birth of his child.

124.   As such, PLAINTIFF was wrongfully terminated and penalized for taking mandatory time off for quarantine, which is a protected medical leave under New York and federal law(s).

125.   The other time that PLAINTIFF took days off were also protected, as PLAINTIFF was entitled to paternity leave due to the birth of his child.

126.   As such, PLAINTIFF was wrongfully terminated for engaging in protected activity and/or for taking leaves that were protected under the laws.

127.   PLAINTIFF was terminated due to a temporary disability and due to his caretaker and/or paternity status.

128.   Upon information and belief, female employees at P&N are allotted retaliation-free time off for maternity reasons.

129.   Upon information and belief, all of PLAINTIFF'S similarly-situated coworkers were allowed retaliation-free mandatory time off due to exposure to COVID-19 and/or to quarantine.

130.   Yet, these protected leaves were held against PLAINTIFF and PLAINTIFF was subjected

to adverse employment actions for needing to take days for quarantine and maternity.

131.  Furthermore, PLAINTIFF found it frustratingly ironic that DEFENDANT ESPINOSA was accusing PLAINTIFF of not being available, when PLAINTIFF asked on multiple occasions if he could stay later, work overtime, and/or pick up a shift and was discriminatorily denied work every single time by DEFENDANTS.

132.  Thus, DEFENDANT ESPINOSA's reasons for terminating PLAINTIFF'S employment were clearly unreasonable, pretextual, and a cover up for DEFENDANTS' unlawful termination.

133.  DEFENDANTS had no good faith business reason for terminating PLAINTIFF's employment.

134.  DEFENDANTS openly and continuously discriminated against PLAINTIFF based on his national origin (Puerto Rican) and due to their actions and/or lack thereof, and emboldened their workers to sexually harass and treat PLAINTIFF with hostility.

135.  DEFENDANTS then wrongfully terminated PLAINTIFF, in part, due to his status as a caretaker and, in part, in retaliation for engaging in protected activities at P&N.

136.  **PLAINTIFF was terminated in retaliation for his protected activities – that is – for complaining about discrimination in the workplace, for complaining about unfair/unequal treatment, for refusing to allow his coworkers to physical/sexually harass and humiliate him, for complaining about being paid properly under the New York Labor Law, and for needing to attend to his caretaker obligations.**

137.  Upon information and belief, DEFENDANTS *did not* have an anti-discrimination or anti-harassment policy in place and/or did not train, counsel, or make its employees aware of the same.

138.  Upon information and belief, DEFENDANTS did not notify its employees about any

policies concerning discrimination in the workplace and had no postings concerning anti-harassment, discrimination, or equal employment opportunities.

139.   DEFENDANTS did not provide a reasonable (or any) avenue for its employees (such as PLAINTIFF) to make complaints about discrimination in the workplace.

140.   DEFENDANTS' non-enforcement of anti-discrimination laws in its workplaces was well known to its employees, which made its employees feel that they were free to abuse, insult, and humiliate PLAINTIFF on a daily basis due to his protected characteristics.

141.   DEFENDANTS' actions and/or lack thereof were of the type that would dissuade reasonable individuals (including PLAINTIFF) from reporting discrimination in the workplace.

142.   PLAINTIFF was subjected to a hostile work environment that was permeated with discriminatory insult, ridicule, verbal harassment, physical assault, humiliating conduct, differential treatment, and other abusive conduct against PLAINTIFF due to his national origin.

143.   If DEFENDANTS did have an anti-discrimination policy in place, DEFENDANTS' anti-discrimination policies were futile and/or not taken seriously by DEFENDANTS - to the detriment of PLAINTIFF.

144.   INDIVIDUAL DEFENDANTS supported, condoned, ratified, and approved of the discrimination, wrongful termination, and hostile work environment at DEFENDANT P&N.

145.   DEFENDANTS allow(ed) an environment to exist that is permeated with discriminatory acts, adverse employment actions, humiliation, and other unlawful acts against its Puerto Rican employee PLAINTIFF.

146.   **To add insult to injury, DEFENDANTS wrongfully terminated PLAINTIFF at the**

18

**worst possible time – when they knew that PLAINTIFF needed his employment and employment benefits due to his newborn child and/or due to his status as a caretaker of a newborn child.**

147.   INDIVIDUAL DEFENDANTS were each acting pursuant to their employments as manager, supervisors, agents, employees, and representatives of their Principal, DEFENDANT P&N.

148.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: ongoing mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

149.   DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

150.   **Punitive damages are warranted against DEFENDANTS individually and collectively.**

**AS A FIRST CAUSE OF ACTION**
**FOR *DISCRIMINATION* UNDER TITLE VII**
*(Against Defendant P&N TOWING AND COLLISION)*

151.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

152.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq*., for relief based upon the unlawful employment practices of DEFENDANT P&N.

153.   DEFENDANT P&N engaged in unlawful employment practices prohibited by 42 U.S.C.

§§ 2000e *et seq*., by discriminating against PLAINTIFF and unlawfully terminating PLAINTIFF's employment because of his sex/gender (male), national origin (Puerto Rican), and caregiver status.

154.   PLAINTIFF was subjected to a discriminatory and hostile work environment and/or a workplace that was permeated with national origin bias, unfair assignment refusals, differential treatment, selective supervision, selective enforcement of rules, harassment, abuse, wrongful termination, and other discriminatory acts.

155.   PLAINTIFF complained about the discriminatory abuse he faced at the hands of his supervisors and coworkers and said complaint(s) were futile and ignored.

156.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

157.   Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT P&N.

158.   At all times, DEFENDANT P&N was aware and/or had actual and constructive notice of its national origin based hostile work environment as well as its gender and caretaker discriminatory acts against PLAINTIFF, and took no action to abate or correct same.

159.   Instead, DEFENDANT ignored, dismissed, and taunted PLAINTIFF, and emboldened its employees to do the same.

160.   DEFENDANTS purported anti-discrimination and anti-retaliation policies (if any) were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

161.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&A, INDIVIDUAL DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

162.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

163.    DEFENDANT P&A is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

164.    As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, adverse employment actions, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

165.    DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

166.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A SECOND CAUSE OF ACTION**
**FOR *RETALIATION* UNDER TITLE VII**
***(Against Defendant P&N TOWING COLLISION)***

167.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

168.    <u>Title VII</u> of the Civil Rights Act of 1964, as amended, <u>42 U.S.C.</u> § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

169.    DEFENDANT P&N engaged in unlawful employment practice prohibited by <u>42 U.S.C.</u> §§ 2000e *et seq*., by discriminating against PLAINTIFF with respect to the terms, conditions, or privileges of employment because of his opposition to the unlawful employment practices at DEFENDANT P&N and for engaging in protected activities.

170. PLAINTIFF was terminated in retaliation for his protected activities – that is – for complaining about discrimination in the workplace, for complaining about unfair/unequal treatment, for refusing to allow his coworkers to physical/sexually harass and humiliate him, for complaining about being paid properly under the New York Labor Law, and for needing to attend to his caretaker obligations.

171. DEFENDANT P&N had no good faith justification for their actions against PLAINTIFF.

172. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT P&N.

173. At all times, DEFENDANTS was aware and/or had actual and constructive notice of its national origin based hostile work environment and took no action to abate or correct same.

174. Instead, INDIVIDUAL DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in a protected activity.

175. DEFENDANT P&N'S purported anti-discrimination, anti-retaliation policies, and COVID-19 paid leave policies, were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

176. But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N, INDIVIDUAL DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

177. DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following his engagement in protected activity.

178. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

179. DEFENDANT P&N is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

180.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, adverse employment actions, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

181.   DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

182.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A THIRD CAUSE OF ACTION FOR *DISCRIMINATION* UNDER NEW YORK STATE EXECUTIVE LAW

183.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

184.   New York State Executive Law § 296 provides that,

> 1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, … to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

185.   DEFENDANTS have engaged in an unlawful discriminatory practice by discriminating against PLAINTIFF because of his sex/gender (male), national origin (Puerto Rican), and caretaker status.

186.   PLAINTIFF was subjected to discrimination at DEFENDANT P&N as alleged above.

187.   PLAINTIFF was subjected to a discriminatory and hostile work environment and/or a workplace that was permeated with national origin bias, unfair assignment refusals,

differential treatment, selective supervision, selective enforcement of rules, harassment, abuse, wrongful termination, and other discriminatory acts.

188. PLAINTIFF complained about the discriminatory abuse he faced at the hands of his supervisors and coworkers and said complaint(s) were futile and ignored.

189. DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

190. Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT P&N.

191. At all times, DEFENDANT P&N was aware and/or had actual and constructive notice of its national origin based hostile work environment as well as its gender and caretaker discriminatory acts against PLAINTIFF and took no action to abate or correct same.

192. But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N TOWING & COLLISION, INDIVIDUAL DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

193. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

194. DEFENDANT P&N is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

195. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

196. DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

197.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A FOURTH CAUSE OF ACTION FOR *RETALIATION* UNDER NEW YORK STATE EXECUTIVE LAW

198.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

199.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

200.    PLAINTIFF complained about the discriminatory abuse he faced at the hands of his supervisors, INDIVIDUAL DEFENDANTS, as well as his coworkers and said complaints were ignored.

201.    Instead, PLAINTIFF was terminated in retaliation for his protected activities – that is – for complaining about discrimination in the workplace, for complaining about unfair/unequal treatment, for refusing to allow his coworkers to physical/sexually harass and humiliate him, for complaining about being paid properly under the New York Labor Law, and for needing to attend to his caretaker obligations.

202.    PLAINTIFF was wrongfully terminated in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT P&N.

203.    DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

204.    Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT P&N.

205.    At all times, DEFENDANTS was aware and/or had actual and constructive notice of its national origin based hostile work environment and took no action to abate or correct

25

same.

206.   Instead, INDIVIDUAL DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in a protected activity.

207.   DEFENDANT'S purported anti-discrimination, anti-retaliation policies, and COVID-19 paid leave policies, were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

208.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N, INDIVIDUAL DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

209.   DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following his engagement in protected activity.

210.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

211.   DEFENDANT P&N is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

212.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, adverse employment actions, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

213.   DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

214.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A FIFTH CAUSE OF ACTION FOR *DISCRIMINATION/RETALIATION*
UNDER NEW YORK STATE EXECUTIVE LAW
(*"Aider and Abettor" Liability Against INDIVIDUAL DEFENDANTS*)**

215.  PLAINTIFF repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

216.  New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

217.  INDIVIDUAL DEFENDANTS engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory and retaliatory conduct of their principal, DEFENDANT P&N.

218.  PLAINTIFF was subjected to acts of unlawful discrimination at DEFENDANT P&N by his supervisors and coworkers, in the presence of and/or with the knowledge of INDIVIDUAL DEFENDANTS.

219.  PLAINTIFF was subjected to a hostile work environment and/or a workplace that was permeated with adverse employment actions, increased scrutiny, differential treatment, selective enforcement, verbal and physical abuse/assault, humiliation, and wrongful termination.

220.  PLAINTIFF was subjected to discrimination at DEFENDANT P&N with direct involvement of INDIVIDUAL DEFENDANTS.

221.  DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

222.  Each DEFENDANT, including INDIVIDUAL DEFENDANTS, acted pursuant to their authorities as agents of DEFENDANTS.

223.  At all times, DEFENDANT P&N was aware and/or had actual and constructive notice of

its national origin based hostile work environment as well as its gender and caretaker discriminatory acts against PLAINTIFF and took no action to abate or correct same.

224.  Instead, INDIVIDUAL DEFENDANTS ignored, dismissed, and subjected PLAINTIFF to differential treatment with regards to work polices, terms and conditions of employment, and benefits, while allowing their employees to subject PLAINTIFF to sexual harassment, care status discrimination, and national origin based hostility without discipline with impunity.

225.  But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

226.  DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following his engagement in protected activity.

227.  PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

228.  As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

229.  INDIVIDUAL DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

230.  PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

**AS A SIXTH CAUSE OF ACTION FOR *DISCRIMINATION*
VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**

231.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this complaint.

232.   The New York City Administrative Code § 8-107(1) provides that

> It shall be an unlawful discriminatory practice: (a) For an employer
> or an employee or agent thereof, because of the actual or perceived
> . . . race/color . . . to refuse to hire or employ or to bar or to
> discharge from employment such person or to discriminate against
> such person in compensation or in terms, conditions or privileges
> of employment.

233.   DEFENDANTS engaged in an unlawful discriminatory practice in violation of New

York City Administrative Code § 8-107(1)(a) by creating and maintaining discriminatory

working conditions, and otherwise discriminating against Plaintiff because of his national

origin.

234.   DEFENDANTS have engaged in an unlawful discriminatory practice by discriminating

against PLAINTIFF his sex/gender (male), national origin (Puerto Rican), and caretaker

status.

235.   PLAINTIFF was subjected to discrimination at DEFENDANT P&N as alleged above.

236.   PLAINTIFF was subjected to a hostile work environment and/or a workplace that was

permeated with national-origin bias, discriminatorily motivated adverse employment

actions, differential treatment, selective, selective enforcement of rules, harassment,

wrongful termination, and other discriminatory acts.

237.   At all times, DEFENDANT P&N was aware and/or had actual and constructive notice of

its national origin based hostile work environment as well as its gender and caretaker

discriminatory acts against PLAINTIFF and took no action to abate or correct same.

238.   Instead, INDIVIDUAL DEFENDANTS ignored and dismissed PLAINTIFF, who was

complaining bullying and discrimination, while allowing the perpetrators to escape discipline with impunity.

239.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

240.   Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT P&N.

241.   At all times, DEFENDANT P&N was aware and/or had actual and constructive notice of its national origin-based work environment against PLAINTIFF and took no action to abate or correct same.

242.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

243.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

244.   DEFENDANT P&N is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

245.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

246.   DEFENDANTS' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

247.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

## AS A SEVENTH CAUSE OF ACTION FOR *RETALIATION* UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

248.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

249.   The New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

250.   DEFENDANTS engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(7) by discriminating against PLAINTIFF because of PLAINTIFF'S opposition to the unlawful employment practices and for engaging in protected activity at DEFENDANT P&N.

251.   PLAINTIFF complained about the discriminatory abuse he faced at the hands of his supervisors, INDIVIDUAL DEFENDANTS, as well as his coworkers and said complaints were ignored.

252.   Instead, PLAINTIFF was terminated in retaliation for his protected activities – that is – for complaining about discrimination in the workplace, for complaining about unfair/unequal treatment, for refusing to allow his coworkers to physical/sexually harass and humiliate him, for complaining about being paid properly under the New York Labor Law, and for needing to attend to his caretaker obligations.

253.   PLAINTIFF was wrongfully terminated in retaliation for engaging in the above-described protected activity and for seeking equal treatment under the laws of the State as well as under the laws, rules, procedures, manuals, and promises of DEFENDANT P&N.

254.   DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

255.   Each DEFENDANT acted pursuant to their authorities as agents of DEFENDANT P&N.

256. At all times, DEFENDANTS was aware and/or had actual and constructive notice of its national origin based hostile work environment and took no action to abate or correct same.

257. Instead, INDIVIDUAL DEFENDANTS attacked and retaliated against PLAINTIFF, who engaged in a protected activity.

258. DEFENDANTS purported anti-discrimination, anti-retaliation policies, and COVID-19 paid leave policies, were futile and not adhered to by DEFENDANTS in any regard - to the detriment of PLAINTIFF.

259. But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N, INDIVIDUAL DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

260. DEFENDANTS had no valid business justification for the retaliatory actions taken against PLAINTIFF following his engagement in protected activity.

261. PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

262. DEFENDANT P&N is strictly liable for the conduct of its supervisors, managers, and owner DEFENDANTS.

263. As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, adverse employment actions, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages, and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

264. DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with

full knowledge of the law.

265.    PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A EIGHTH CAUSE OF ACTION
### FOR *DISCRIMINATION/RETALIATION UNDER* THE NYCHRL
### *(Aider and Abettor Liability Against INDIVIDUAL DEFENDANTS)*

266.    PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above

paragraphs of this complaint.

267.    The New York City Administrative Code § 8-107(6) provides that it shall be unlawful

discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing

of any of the acts forbidden under this chapter, or attempt to do so."

268.    DEFENDANTS engaged in an unlawful discriminatory practice in violation of New

York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling, and

coercing the above discriminatory and unlawful conduct of their employer,

DEFENDANT P&N TOWING & COLLISION.

269.    PLAINTIFF was subjected to acts of unlawful discrimination at DEFENDANT P&N by

his supervisors and coworkers, in the presence of and/or with the knowledge of

INDIVIDUAL DEFENDANTS.

270.    PLAINTIFF was subjected to a hostile work environment and/or a workplace that was

permeated with adverse employment actions, increased scrutiny, differential treatment,

selective enforcement, verbal and physical abuse/assault, humiliation, and wrongful

termination.

271.    PLAINTIFF was subjected to discrimination at DEFENDANT P&N with direct

involvement of INDIVIDUAL DEFENDANTS.

272.    DEFENDANTS had no good faith justification for their actions against PLAINTIFF.

273.    Each DEFENDANT, including INDIVIDUAL DEFENDANTS, acted pursuant to their

authorities as agents of DEFENDANTS.

274.   At all times, DEFENDANT P&N was aware and/or had actual and constructive notice of its national origin based hostile work environment as well as its gender and caretaker discriminatory acts against PLAINTIFF and took no action to abate or correct same.

275.   Instead, INDIVIDUAL DEFENDANTS ignored, dismissed, and subjected PLAINTIFF to differential treatment with regards to work polices, terms and conditions of employment, and benefits, while allowing their employees to subject PLAINTIFF to sexual harassment, care status discrimination, and national origin based hostility without discipline with impunity.

276.   But for INDIVIDUAL DEFENDANTS' respective positions at DEFENDANT P&N, DEFENDANTS would not have been able to subject PLAINTIFF to the discriminatory treatment alleged above.

277.   DEFENDANTS had no valid business justification for the retaliatory and termination actions taken against PLAINTIFF following his engagement in protected activity.

278.   PLAINTIFF was extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

279.   As a result, PLAINTIFF was unlawfully humiliated, degraded and belittled, suffered a violation of his rights, suffered: mental and emotional distress, loss of income/earnings, loss of employment, loss of employment opportunities, loss of benefits, inconvenience, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages and other emotional distress, loss of enjoyment of life and other non-pecuniary losses.

280.   INDIVIDUAL DEFENDANTS' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

281.   PLAINTIFF is entitled to the maximum amount of damages allowed under this statute.

### AS A NINTH CAUSE OF ACTION FOR *ASSOCIATIONAL DISCRIMINATION* UNDER THE AMERICAN WITH DISABILITIES ACT

282.   PLAINTIFF repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint.

283.   PLAINTIFF asserts that DEFENDANT P&N violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended.

284.   Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states:

    (a)   General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

285.   The ADA also forbids discrimination against those due to their association with persons with disabilities and/or "associational discrimination."

286.   DEFENDANT P&N believed PLAINTIFF'S daughter had a disability, whether actual and/or perceived, which required a reasonable accommodation.

287.   PLAINTIFF would have been able to complete the duties of his job with or without reasonable accommodation.

288.   But for PLAINTIFF'S daughter's disabilities - whether actual and/or perceived - and/or perceived need for a reasonable accommodation, DEFENDANT GUARDIAN would not have wrongfully terminated or suspended his employment.

289.   DEFENDANTS also discriminated against PLAINTIFF by terminating his employment.

290.   DEFENDANT P&N had no good-faith business justification for their actions against PLAINTIFF.

291.  GUARDIAN P&N engaged in an unlawful discriminatory practice by assuming that PLAINTIFF was disabled or had a disability, and then by taking adverse employment actions against PLAINTIFF based on said perception.

292.  DEFENDANTS engaged in an unlawful discriminatory practice by assuming that PLAINTIFF'S daughter was disabled or had a disability, and then by taking adverse employment actions against PLAINTIFF based on said perception.

293.  DEFENDANT P&N supported, condoned, and ratified the unlawful discriminatory conduct of its officers, directors, representatives, and DEFENDANT ESPINOSA, when it wrongfully terminated and/or suspended PLAINTIFF.

294.  As a result of the acts and conduct complained of herein, PLAINTIFF suffered a loss of income, loss of employment, loss of benefits, loss of income opportunities, the loss of a salary/pay, special damages, loss of other compensation which such employment entails, and PLAINTIFF has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, special damages, humiliation, embarrassment, loss of enjoyment of life and other non-pecuniary losses.

295.  PLAINTIFF has further experienced severe emotional and physical distress.

296.  As such, PLAINTIFF has been damaged as set forth herein and is entitled to the maximum award of damages under this law.

## AS A TENTH CAUSE OF ACTION FOR
## FAILURE TO FURNISH PROPER WAGE NOTICE
## IN VIOLATION OF THE NYLL § 195(3)

297.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with

the same force and effect as if more fully set forth herein.

298.   NYLL § 195(3) required DEFENDANT P&N to:

> furnish each employee with a statement with every payment of
> wages, listing the following:  the dates of work covered by that
> payment of wages;  name of employee;  name of employer;
> address and phone number of employer;  rate or rates of pay and
> basis thereof, whether paid by the hour, shift, day, week, salary,
> piece, commission, or other;  gross wages;  deductions;
> allowances, if any, claimed as part of the minimum wage;  and net
> wages.  For all employees who are not exempt from overtime
> compensation as established in the commissioner's minimum wage
> orders or otherwise provided by New York state law or regulation,
> the statement shall include the regular hourly rate or rates of pay;
> the overtime rate or rates of pay;  the number of regular hours
> worked, and the number of overtime hours worked.  For all
> employees paid a piece rate, the statement shall include the
> applicable piece rate or rates of pay and number of pieces
> completed at each piece rate.  Upon the request of an employee,
> an employer shall furnish an explanation in writing of how such
> wages were computed.

299.   As described above, Defendant P&N failed to furnish PLAINTIFF with his wage notice

and statement regarding payment owed to PLAINTIFF at the time of his termination - let

alone one accurately containing all of the criteria required under the NYLL.

300.   Instead, and despite PLAINTIFF'S protestations, DEFENDANTS paid PLAINTIFF

*"under the table"* in cash from the end of September 2021 through and/or until January

2022.

301.   Pursuant to NYLL § 198(1-b), Defendant P&N is liable to Plaintiff in the amount of

$50.00 for each day after the violation occurred, up to the statutory cap.

302.   PLAINTIFF is entitled to the maximum amount of damages, fees, penalties, and costs

allowed under this statute.

## AS AN ELEVENTH CAUSE OF ACTION FOR
## FAILURE TO PAY SICK LEAVE IN VIOLATION OF NYLL 196(b)

303.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

304.    NYLL § 196 states that for employers with between five and ninety-nine employees in any calendar year, each employee shall be provided with up to forty hours of paid sick leave in each calendar year.

305.    NYLL § 196 applies to DEFENDANT P&N because it is an employer who operates its business within New York State and has more than five employees.

306.    As described above, DEFENDANT P&N failed to pay PLAINTIFF for the leave DEFENDANTS forced PLAINTIFF to take even though PLAINTIFF tested negative for COVID-19.

307.    DEFENDANT had options – to pay PLAINTIFF his sick leave or to allow PLAINTIFF to apply for leave under the New York Laws related to COVID-19 leave (including the Paid Family Leave Act).

308.    DEFENDANTS refused to allow PLAINTIFF to benefit from either option, in violation of the laws of the State of New York.

309.    Pursuant to NYLL § 198(1-a), is subject to penalties which include payment of the unpaid wages, attorney's fees, prejudgment interest, and an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due.

310.    PLAINTIFF is entitled to the maximum amount of damages, fees, penalties, and costs allowed under this statute.

## JURY DEMAND

311.    PLAINTIFF requests a jury trial on all issues to be tried.

**WHEREFORE**, PLAINTIFF respectfully requests a judgment against DEFENDANTS:

A.    Declaring that DEFENDANTS engaged in unlawful employment practices prohibited by Title VII, the NYSHRL, the NYCHRL, and the ADA, in that DEFENDANTS discriminated against PLAINTIFF on the basis of his gender/sex (male), national origin (Puerto Rican), and care taker status by terminating PLAINTIFF'S employment.

B.    Awarding PLAINTIFF damages for DEFENDANTS' violations under the State Law Causes of action, including for violations of the NYLL statutes alleged;

C.    Awarding damages to PLAINTIFF for all lost wages and benefits resulting from DEFENDANTS' unlawful discrimination and to otherwise make his whole for any losses suffered as a result of such unlawful employment practices;

D.    Awarding PLAINTIFF compensatory damages for mental and emotional distress, pain and suffering and injury to his reputation in an amount to be proven;

E.    Awarding PLAINTIFF punitive damages;

F.    Awarding PLAINTIFF attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G.    Awarding PLAINTIFF such other and further relief as the Court may deem equitable, just and proper to remedy DEFENDANTS' unlawful employment practices.

Dated: New York, New York
       December 6, 2022

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:

Gregory Calliste, Jr., Esq.
*Attorney for Plaintiff*
45 Broadway, Suite 430
New York, New York 10006
T: (212) 248-7431
F: (212) 901-2107
gcalliste@tpglaws.com

# Exhibit A

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Victor Cortes<br>c/o Phillips & Associates, Attorneys at Law, PLLC 45 Broadway,<br>Suite 430<br>New York, NY 10006 | From: New York District Office<br>33 Whitehall St, 5th Floor<br>New York, NY 10004 |
|---|---|

| EEOC Charge No.<br>520-2022-06037 | EEOC Representative<br>Michell ChangQui,<br>Federal Investigator | Telephone No.<br>9295065318 |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

　Less than 180 days have elapsed since the filing date. I certify that the Commission s processing of this charge will not be completed within 180 days from the filing date.

　The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By:Timothy Riera
11/23/2022

Enclosures(s)

**Timothy Riera**
**Acting District Director**

cc:
　Gregory Calliste
　Phillips & Associates, Attorneys at Law, PLLC
　45 Broadway Suite 430
　New York, NY 10006
　Ana Taylor
　45 broadway suite 430
　MANHATTAN, NY 10006